**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **INTERNATIONAL PLAYTHINGS LLC, *et al.*,** | : | Civ. No. 2:11-6832 (KM) |
| | : | |
| **Plaintiffs,** | : | **OPINION** |
| | : | |
| **v.** | : | |
| | : | |
| **TOY TECK LTD, LLC, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |

**KEVIN MCNULTY, U.S.D.J.:**

This copyright infringement action arises from the allegation of the Plaintiffs, International Playthings LLC and Epoch Company, Ltd. (collectively, "International Playthings"), that their Calico Critters homes were used in an advertisement for Teacup Families, a competing line of toys. Defendants Toy Teck Ltd, LLC ("Toy Teck"), Toy Teck Corporation ("Toy Teck Corp."), Manley Toys, Ltd. ("Manley Toys"), and Toy Teck Limited (Hong Kong) ("Toy Teck (Hong Kong)"), and Mitchell August are alleged to produce that competing Teacup Families product line. Defendant Aquawood LLC ("Aquawood") helped to create the advertisement, which aired on television and was uploaded to youtube.com, where it could be viewed on the internet.

Before the Court are three pending motions. First, August has moved to dismiss the claims against him for lack of personal jurisdiction and for failure to state a claim. Second, Aquawood has moved to dismiss for lack of personal jurisdiction. Third, Manley Toys and Toy Teck (Hong Kong) have moved to vacate the default judgment entered against them.

The allegations of the First Amended Complaint do not establish personal jurisdiction over August. I will, however, administratively terminate August's motion to dismiss, subject to renewal after limited jurisdictional discovery. Aquawood's motion to dismiss is also terminated subject to renewal after limited jurisdictional discovery. Finally, I will vacate the default entered against Manley Toys and Toy Teck (Hong Kong).

1

## I.    BACKGROUND

### A. Facts

According to the First Amended Complaint ("FAC" [Docket No. 42]),[1] International Playthings created a line of collectible plastic toys called Calico Critters. (FAC ¶ 1). In addition to the Critters themselves, the line included accessories, such as homes, playground sets, furniture, and the like. (*Id.* ¶ 20). One of the houses is called the Cozy Cottage, a two-story, cottage style house with tan clapboard siding, an orange colored, shingled, gable-shaped roof, and a light tan chimney. (*Id.* ¶¶ 26). International Playthings has copyrighted the items in and related to the Calico Critters line, including the Cozy Cottage. (*Id.* ¶ 19). The Calico Critters line can be found nationwide; distribution channels include major retailers, such as Toys "R" Us, smaller independent toy stores, catalogs, e-commerce sites, and bookstores. (*Id.* ¶ 23). International Playthings advertises by such means as in-store events and displays, television, and the internet. (*Id.* ¶ 24).

Sometime in 2011, Manley, Toy Teck, Aquawood, and August[2] created the Teacup Families line of plastic figures to compete with Calico Critters. (*Id.* ¶ 28). Teacup Families toys are distributed and advertised in a manner similar to that of Calico Critters. (*Id.* ¶¶ 30-31).

The Teacup Families line of products was not as extensive as Calico Critters – its accessories were limited to one house, a car/van, and a limited amount of playground equipment. (*Id.* ¶ 33). Unlike Calico Critters, the Teacup Family line did not include accessories that would permit children to create a neighborhood for the dolls. (*Id.* ¶ 34). Nevertheless, a Teacup Families advertisement displayed Teacup Families dolls in a neighborhood. (*Id.* ¶ 39). That neighborhood was composed, not entirely of Teacup Families products, but of Calico Critters houses and accessories (albeit not identified as such). (*Id.*). Specifically, the advertisement contained at least three Cozy Cottages that

---

[1] The allegations of the Complaint have not yet been tested by any fact finder. This discussion, as it must, assumes their truth solely for the purpose of analyzing a motion based on Rule 12(b)(2) and (6). *See* pp. 4, 9, *infra.*

[2] Manley Toys is alleged to be the parent company of Toy Teck Ltd. LLC and Toy Teck Corporation, which supposedly operated the Teacup Families business in the United States. August was the president of Toy Teck (Hong Kong) until January 2010 and a consultant until February 2012. Toy Teck (Hong Kong) is seemingly a related entity that played some role in manufacturing the products and developing the advertisement. Aquawood indirectly purchased the television advertising spots.

had been altered – for example, by painting them a different color – to disguise their origin to some degree. (*Id.* ¶ 40). This advertisement, it is alleged, falsely depicted the Teacup Families product line and wrongly implied that consumers could purchase Cozy Cottages accessories from Manley and Toy Teck when, in fact, they were an exclusive product of International Playthings.[3] (*Id.*).

International Playthings alleges that Manley, Toy Teck, Aquawood, and August intentionally used the Cozy Cottages in their advertisements to deceive and "confuse consumers, damage International Playthings' reputation and goodwill, and undermine sales of Calico Critters products." (*Id.* ¶ 46). From International Playthings' perspective, these actions give rise to a number of causes of action: unfair competition, false advertising and false designation of origin under the Lanham Act, *see* 11 U.S.C. § 1125(a)(1); federal copyright infringement, *see* 11 U.S.C. § 501(a); common law unfair competition; unfair competition under the New Jersey Fair Trade Act, N.J. Stat. Ann. § 56:4-1, *et seq.*; and unjust enrichment.

Procedural History

On November 22, 2011, International Playthings filed its initial complaint, which, in addition to the claims described above, sought temporary restraints and a preliminary injunction against airing and posting online the allegedly offending advertisement. On December 15, 2011, District Judge Wigenton issued the requested preliminary injunction.

On May 18, 2012, International Playthings filed the First Amended Complaint. The Court has federal question jurisdiction over the federal copyright claims. *See* 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1338(a). Supplemental jurisdiction exists over the state and common law claims because they are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact. *See* 28 U.S.C. § 1367. Personal jurisdiction, as discussed below, is contested.

---

[3] International Playthings did not license or authorize any of the Defendants to reproduce, manufacture, import, display, market, sell, or distribute any of its products. (*Id.*¶ 45).

## II.   AUGUST'S MOTION TO DISMISS

### A. Personal Jurisdiction

August has moved to dismiss the complaint based on this Court's lack of personal jurisdiction over him. At this point I find that International Playthings has not proffered the requisite prima facie showing that personal jurisdiction exists over August. There is reason to think, however, that it might be able to do so. In accordance with Third Circuit law, therefore, I will permit limited jurisdictional discovery.

#### 1. *Legal Standard*

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing sufficient facts to show that jurisdiction exists. *Marten v. Godwin*, 499 F.3d 290, 295-96 (3d Cir. 2001). While a court must accept the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff, *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002), the court must still examine any evidence presented with regard to disputed factual allegations. *See, e.g., Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 155-56 (3d Cir. 2010) (examining the evidence supporting the plaintiff's allegations); *Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990) ("'A Rule 12(b)(2) motion, such as the motion made by the defendants here, is inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.'") (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).

The plaintiff "need only establish a prima facie case of personal jurisdiction." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). Nevertheless, a plaintiff may not "rely on the bare pleadings alone" in order to withstand a motion to dismiss for lack of personal jurisdiction; "[o]nce the motion is made, plaintiff must respond with actual proofs, not mere allegations." *Patterson*, 893 F.2d at 604 (internal citations omitted); *Time Share Vacation Club*, 735 F.2d at 66 n.9.

To assess whether it has personal jurisdiction over a defendant, a district court must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert, AG*, 155

F.3d 254, 259 (3d Cir. 1998). First, the court must analyze the relevant state's long-arm statute to see whether it permits the exercise of personal jurisdiction. *Id.*; Fed. R. Civ. P. 4(k). In other words, "[a] federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales*, 384 F.3d at 96. "Second, the court must apply the principles of due process." *WorldScape, Inc. v. Sails Capital Mgmt.*, Civ. 10-4207, 2011 WL 3444218 (D.N.J. Aug. 5, 2011) (citing *IMO Indus.*, 155 F.3d at 259).

In New Jersey, the first step collapses into the second because "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Miller Yacht Sales*, 384 F.3d at 96 (citing N.J. Ct. R. 4:4-4(c)). Accordingly, personal jurisdiction over a non-resident defendant is proper in this Court if the defendant has "'certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 316 (1945)).

There are two kinds of personal jurisdiction that allow a district court to hear a case involving a non-resident defendant: general and specific. *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-415 & n. 9 (1984). A court may exercise general jurisdiction when a defendant has "continuous and systematic contacts" with the forum state. *Id.* at 415 n. 9. The defendant's "contacts need not relate to the subject matter of the litigation," *Ameripay, LLC v. Ameripay Payroll, Ltd.*, 334 F. Supp 2d 629, 633 (D.N.J. 2004), but must rise to "a 'very high threshold of business activity.'" *Id.* at 633 (quoting *Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877, 891 (3d Cir. 1981)). The facts required to establish sufficient contacts for general jurisdiction must be extensive and persuasive. *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 589 (3d Cir. 1982). In other words, the plaintiff must demonstrate "significantly more than minimum contacts." *Provident Nat'l Bank*, 819 F.2d at 437.

In contrast to general jurisdiction, specific jurisdiction relies on the defendant's forum-related activities that give rise to the plaintiff's claims. *See Helicopteros*, 466 U.S. at 413-14. Establishing specific jurisdiction involves a three-part inquiry: (1) whether the defendant purposefully directed its activities at the forum; (2) whether the litigation arises out of or relates to at least one of the contacts; and (3) whether the exercise of jurisdiction otherwise comports

with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 317 (3d Cir. 2007). The defendant need not be physically located in the state while committing the alleged acts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985). Nor is specific jurisdiction defeated merely because the bulk of harm occurred outside the forum. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 780 (1984). A single act may satisfy minimum contacts if it creates a substantial connection with the forum. *Burger King,* 471 U.S. at 476 n. 18.

### 2. *Is There General Jurisdiction over August?*

General jurisdiction over August presupposes continuous and systematic contacts that rise to "a very high threshold of business activity" with New Jersey. *Ameripay, LLC v. Ameripay Payroll, Ltd.,* 334 F. Supp 2d 629, 633 (D.N.J. 2004) (quotation and citation omitted). International Playthings attempts to make such a showing by imputing all Teacup Families activities to August individually. It believes this is proper because the United States-based entities, Toy Teck and Toy Teck Corp., dissolved in 2008 and 2009, respectively – before Teacup Families was created – and Toy Teck (Hong Kong) is not authorized to transact business in the United States. By process of elimination, says International Playthings, August must be a sole proprietor, responsible for all Teacup Families activity in the United States. As corroboration, International Playthings points to the packaging of Teacup Family products, which states "Distributed by Toy Teck Limited, Waterford, Michigan 48328" – the town where August lives. (FAC, Ex. C [Docket No. 42-5]). To this, International Playthings adds the fact that Teacup Families products were sold through major retailers in New Jersey and elsewhere.

I reject International Playthings' contention that August must be regarded as a sole proprietor, and find that his contacts with New Jersey are not sufficient to establish personal jurisdiction. International Playthings' inferences are by no means inescapable; indeed, it is alleged that some corporate entity was responsible for distributing Teacup Families products nationwide. There is no positive evidence or supported allegation that August was personally responsible for the distribution of those toys.

> [A]ctions taken *within the forum state* by a corporate official in his official capacity may be considered for purposes of establishing jurisdiction over him in his individual capacity. However, actions taken by an individual in his corporate capacity outside the forum state are not necessarily enough to establish jurisdiction over the

individual. . . . I will not, however, impute to [the sole corporate officer] the actions of [the corporation] taken in New Jersey unless [the plaintiff] has established that the specific action within New Jersey was taken by [the corporate officer] himself.

*Educ. Testing Serv. v. Katzman*, 631 F. Supp. 550, 559 (D.N.J. 1986) (emphasis in original). *See MoneyGram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, 65 F. App'x 844, 850 (3d Cir. 2003) (non-precedential) ("It is axiomatic that 'jurisdiction over . . . [individual] defendants does not exist simply because they are agents or employees of organizations which presumably are amenable to jurisdiction in' a particular forum." (quoting *Nicholas v. Saul Stone & Co.*, 224 F.3d 179, 184 (3d Cir. 2000) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984)))). "Each defendant's contacts with the forum state must be assessed individually." *Keeton*, 465 U.S. at 781 n. 13.

In short, the necessary facts are insufficiently developed. These missing facts are crucial because August himself did not reside in New Jersey or conduct any business here, nor did he have any employees or offices in New Jersey. (*Id.* ¶¶ 8-9).

At best, the address on the products implies that some entity based in the same zip code as August distributed the products. The packaging itself contains no direct link to August. This is bolstered by August's position with Toy Teck (Hong Kong) at the time the Teacup Families line of products was introduced: a consultant with no authority over the events and acts giving rise to this dispute. (August Decl. ¶ 7, Ex. B to Opp. [Docket No. 44-2]). While Toy Teck (Hong Kong) allegedly is not authorized to do business in the United States, it is possible that it does so anyway; it is also possible (and perhaps more likely) that it distributes its products through another entity that is licensed to do so.

In short, the allegations of the FAC are not sufficient to establish any continuous and systemic contacts between August and the State of New Jersey for purposes of general jurisdiction. *See MoneyGram*, 65 F. App'x at 850 ("MoneyGram's attempt to ensnare Roberto and Freddie Lopez in a jurisdictional web by reciting Consorcio's contacts with New Jersey both ignores and obfuscates Consorcio's separate legal identity. Although MoneyGram has clearly asserted a sufficient basis for *in personam* jurisdiction over Consorcio, its Complaint falls woefully short of establishing the nexus necessary to extend that jurisdiction to either Freddie or Roberto Lopez."). As

August's contacts do not satisfy the general jurisdiction test, I now turn to whether his contacts are sufficient for specific jurisdiction.

### 3. *Is There Specific Jurisdiction over August?*

A district court uses the following three-part test to determine whether specific jurisdiction exists: (1) whether the defendant purposefully directed its activities at the forum; (2) whether the litigation arises out of or relates to at least one of the contacts; and (3) whether the exercise of jurisdiction otherwise comports with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 317 (3d Cir. 2007).

To be subject to specific jurisdiction, August must have deliberately targeted the forum state of New Jersey. *O'Connor,* 496 F.3d at 317. "[T]he 'unilateral activity of those who claim some relationship with a nonresident defendant' is insufficient. And contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself." *Id.* (quoting *Hanson,* 357 U.S. at 253).

International Playthings argues that August, by airing the offending advertisement nationally, purposefully directed the allegedly infringing activity at New Jersey, where the advertisement would inevitably be seen. But this argument again depends on International Playthings' contention that August is as a sole proprietor, individually responsible for all Teacup Families activity in the United States. That contention has no more force here than it did in the general jurisdiction context.

An August 15, 2011 press release announces a new line of Teacup Families products, quoting August and identifying him as the President of Toy Teck Ltd. This, declares International Playthings, implicates August in marketing efforts, and therefore in the infringing advertisement. But the mention of August's name in a press release does not imply that he created another marketing campaign that resulted in (later) commercials airing in New Jersey. August himself denies any involvement in the allegedly infringing commercials. (August Decl. ¶ 8, Ex. B to Opp.). As International Playthings has nto put forth any proof of August's individual role, I cannot find that specific jurisdiction exists.[4]

---

[4] Given that August has not purposefully directed any activity at New Jersey, I need not review the other two prongs of the traditional three-part test.

As the Court has neither general nor specific jurisdiction over August, his Motion to Dismiss for lack of personal jurisdiction would typically be granted. Before dismissing, however, I must consider International Playthings' request for jurisdictional discovery. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) ("before the district court dismisses for lack of personal jurisdiction," the court must determine whether the plaintiff makes the "required threshold showing" to pursue jurisdictional discovery). The standard is straightforward: the claim cannot be "clearly frivolous" and the plaintiff bears the burden of demonstrating facts "that suggest with reasonable particularity the possible existence of the requisite contacts between the party and the forum state." *Id.* The claims that August and others used a Cozy Cottage in an advertisement are non-frivolous, as are the claims that link the advertisement with New Jersey. I note that the relevant jurisdictional facts appear to be entirely in Defendants' control. The gaps in International Playthings' pleadings may well reflect nothing more than the Toy Teck entities' opaque corporate arrangements.

Accordingly, I will permit some limited jurisdictional discovery. One area to be explored is the manner in which Teacup Families toys flow from Toy Teck (Hong Kong) into United States retail stores. Another is the relationship between August and the Toy Teck entities, including Toy Teck Limited, the company listed on Teacup Families packaging. Such discovery must be focused on the existence, or not, of ties to New Jersey that would justify the exercise of personal jurisdiction.

## B. Failure to State a Claim

August has also moved to dismiss the FAC for failure to state a claim. In the interest of efficiency, and for the guidance of the parties, I note that the FAC's allegations relating to August do not currently meet the *Twombly/Iqbal* pleading standards and would ordinarily require dismissal. Should the jurisdictional hurdles be overcome, International Playthings may wish to consider amending its allegations substantively, as well as jurisdictionally.

### 1. *Rule 12(b)(6) Standard*

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party, ordinarily the defendant, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). For purposes of a motion to dismiss, the well-pleaded

factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by intervening Supreme Court case law).

The United States Supreme Court has elaborated on the standards that a court is to apply in analyzing a Rule 12(b)(6) motion to dismiss, particularly in light of the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Thus the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, demonstrating that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.,* 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal,* 556 U.S. at 678.

The United States Court of Appeals for the Third Circuit has explicated the *Twombly/Iqbal* standard on several occasions. *See, e.g., Argueta v. U.S. Immigration & Customs Enforcement,* 643 F.3d 60, 70-73 (3d Cir. 2011); *Santiago v. Warminster Twp.,* 629 F.3d 121, 129-30 (3d Cir. 2010); *Fowler v. UPMC Shadyside,* 578 F.3d 203, 209-211 (3d Cir. 2009). In doing so, it has provided a three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See [Iqbal,* 556 U.S.] at 675; *Argueta,* 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal,* 556 U.S. at 679; *Argueta,* 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679; *Argueta,* 643 F.3d at 73. This last step is "a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

### 2. *Analysis*

The FAC alleges that the Defendants, as a group, used a product copyrighted by International Playthings in advertising their own competing line of products. It does not, however, specify anything August did relating to the alleged infringement. August adds that he was not personally involved in the making of the advertisement.

"To be personally liable, . . . [an individual] must personally take part in infringing activities or specifically direct [others] to do so." 4 McCarthy on Trademarks and Unfair Competition § 25:24 (4th ed.). As the Eleventh Circuit has stated,

> Merely selling the items cannot turn [a participant] into a moving, active, conscious force who caused the infringement; if it did, the entire sales force of infringing companies would be personally liable. *The individual liability standard does not ask whether the individual participated or engaged in some infringing act; instead, it asks whether he actively participated as a moving force in the decision to engage in the infringing acts,* or otherwise caused the infringement *as a whole* to occur.

*Chanel, Inc. v. Italian Activewear of Fl., Inc.,* 931 F.2d 1472, 1478 n. 8 (11th Cir. 1981) (emphases added). The Third Circuit has phrased this standard in different terms: a "central figure" of the infringing entity may be personally liable if he or she "authorize[s] and approve[s]" the infringing acts. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978); *see Elec. Lab. Supply Co., Inc. v. Cullen,* 977 F.2d 798, 807 (3d Cir. 1992) (stating that "*Donsco* indicates that a person who *knowingly and significantly* participates in another's act of trademark infringement is himself guilty of infringement" (emphasis added)); *see also Omega, S.A. v. Giftland Co.,* Civ. No. 03-5808, 2005 WL 1925791 (D.N.J. Aug. 11, 2005) (denying plaintiffs' motion for summary judgment against individual alleged to have helped operate a website selling counterfeit watches).

To be liable, August must have knowingly and significantly participated in the alleged infringement, *i.e.*, the making and airing of the commercial. The allegations in the FAC do not satisfy that standard. The FAC identifies nothing August specifically did in relation to the advertisement; he is simply lumped together with a number of other defendant entities. One cannot discern what, if anything, he personally did to create the advertisement at issue. Therefore, as to August, the FAC would have to be dismissed.[5] I will, however, terminate the the motion to dismiss administratively, subject to reinstatement after jurisdictional discovery has established, or failed to establish, a basis for jurisdiction over the person of August.

## III.   AQUAWOOD'S MOTION TO DISMISS

Aquawood, which allegedly helped develop the infringing advertisement, argues that this Court possesses neither general nor specific personal jurisdiction over it, and that therefore the FAC must be dismissed. International Playthings responds that personal jurisdiction does exist based on a contract that Aquawood entered into with Beacon Media Group LLC ("Beacon Media"). I find that the FAC, as pleaded, establishes neither general nor specific jurisdiction over Aquawood. The application of principal-agent principles to Aquawood's contract with Beacon Media, however, suggests that limited jurisdictional discovery may be fruitful.

### A. Is There General Jurisdiction over Aquawood?

International Playthings argues that Aquawood has such a connection with New Jersey by (1) entering into a contract with Beacon Media, a New Jersey advertising agency, to develop an advertisement that was shown in New Jersey via cable and network television broadcasts and the internet, and (2) directing payments to Beacon Media in New Jersey to fund this campaign.

Specifically, International Playthings states that Aquawood contracted with Beacon Media to purchase airtime for the Teacup Families commercial.

---

[5] Again, International Playthings raises the "sole proprietorship." I reject it here for the same reasons I rejected it in the context of personal jurisdiction. International Playthings also invokes judicial estoppel, claiming that August has taken inconsistent positions regarding his connection to the various Toy Teck entities. I am not persuaded at this point that such statements were wholly inconsistent, but at any rate they are tangential to the issue at hand. Allegations linking August to the actual infringement are still lacking, and the U.S.-based entities named by International Playthings were both dissolved before the commercial was made.

Verifying this is a March 11, 2008 memo from Aquawood addressed to "To Whom It May Concern," which states:

> This is to confirm that Beacon Media is the agency of record for Aquawood, LLC for all national media buys as of March 11, 2008. Aquawood, LLC will assume liability and guarantees payment for all authorized and approved orders placed by Beacon Media.

(Ex. A to Pizzi Dec. [Filed Under Seal]; *see also* Ex. B to Pizzi Dec. [Filed Under Seal] (document entitled "Media Authorization" and signed by Aquawood, stating "[t]his authorizes Beacon Media to order the following media on behalf of Aquawood LLC.")).

The campaign ran nationally on network and cable television from October 18, 2010 to November 27, 2011, at a cost of over $2 million. This included the New Jersey market. Aquawood paid Beacon Media for its efforts through checks mailed to Beacon Media's office in Mahwah, New Jersey. (Ex. D to Pizzi Dec. [Filed Under Seal]). The checks reference a number of invoices from Beacon Media. (*Id.*). All of these activities, International Playthings contends, amount to continuous and systemic contact with New Jersey.

Aquawood replies that this is a misleading picture of its relationship with Beacon Media. In fact, it never directly interacted with Beacon Media. Instead, it retained a media planner, Deitch Media, which engaged Beacon Media. Deitch Media, which is not based in New Jersey, was hired to determine when and on which networks the Teacup Families ad would air. Deitch Media duly presented a plan to Aquawood, which agreed. Only at that point did Deitch Media contact a media buyer – in this case, Beacon Media. Aquawood states it had no control over which firm Deitch Media selected. Aquawood only signed the authorizations empowering Beacon Media to buy airtime because Deitch Media told Aquawood it was necessary. With regards to the invoices, Deitch Media, too, was mainly responsible. It received them and told Aquawood what it had to pay. Aside from mailing checks, Aquawood maintains, there are no emails, letters, or other communications between Aquawood and Beacon Media.[6] In other words, there is nothing, aside from mailing a few checks at the direction of its media buyer, connecting it to Beacon Media and New Jersey.

---

[6] In addition, Aquawood notes that it otherwise has no connection to New Jersey – it is based in California, sells no products in the United States, has no offices, bank accounts, real estate, other assets, or employees in New Jersey,

And, mailing nine checks at the direction of another is not continuous and systemic.

The relationship between Aquawood and Deitch Media is best described as a principal-agent relationship. *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1435 (3d Cir. 1994) ("An agent is a person who represents another in contractual negotiations or transactions akin thereto." (internal quotation omitted)); *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 337, 634 A.2d 74, 79 (1993) ("An agency relationship is created when one party consents to have another act on its behalf, with [either] the principal controlling and directing the acts of the agent" or the totality of the circumstances pointing to the existence of an agency relationship); *cf. Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp. 2d 601, 609-10 (D.N.J. 2004) (where a subsidiary does business in a forum that would otherwise have to be done by the parent entity, such as by entering into contracts on behalf of the parent, "courts have said that the subsidiary may be acting as an agent of the parent, and thereby able to subject the parent to personal jurisdiction in the forum" (citing *Tsegaye v. Impol Aluminum Corp.*, Civ. No. 01-5943, 2003 WL 221743, at *5 (S.D.N.Y. Jan. 30, 2003) (finding no agency relationship where subsidiary did not have "any power to sign contracts on behalf of [the parent,] to bind it in any way," or "place or accept orders on behalf of" the parent "because it cannot be said that [the subsidiary] can do all of the business [the parent] could do were its own officials present in New York"))). Here, Aquawood, the principal, hired Deitch Media to work on its behalf to engage a media buyer – *i.e.*, as its agent.

This is an important relationship for the purposes of personal jurisdiction because "it is black-letter law that the substantial, continuous activity of agents of a corporation within a jurisdiction establishes the minimum contacts which are required by due process." *Sablic v. Croatia Line*, 315 N.J. Super. 499, 504, 719 A.2d 172, 174 (App. Div. 1998) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (other citation omitted)). "Substantial continuous activity within the state by one corporation acting as agent for another authorizes the courts of the state to exercise general *in personam* jurisdiction over the principal." *Sablic*, 315 N.J. Super. at 504, 719 A.2d at 174 (citing *Grand Entertainment Group v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993) (other citation omitted)). What this means is that to the extent Deitch Media is subject to personal jurisdiction in this District, so is Aquawood.

"[W]here the defendant deliberately . . . has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985) (internal citations omitted). Here such continuing obligations exist: the result of hiring Beacon Media was over $2 million of advertising airtime spread over thirteen months. Thus Deitch Media's contacts with Beacon Media (in New Jersey) that relate to this agreement may constitute purposeful availment. *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) ("The fact that a non-resident has contracted with a resident of the forum state is not, by itself, sufficient to justify personal jurisdiction over the nonresident. The requisite contacts, however, may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties." (citing *Burger King*, 471 U.S. at 479)).

Where there is smoke, there is often fire, and here there is plenty of smoke. Aquawood's president stated that Deitch Media contacted Beacon and reached an agreement that resulted in the advertising campaign at issue. This presumably involved some exchange of telephone calls, email, and regular mail, which might entail Aquawood reaching into New Jersey. The contract may even contemplate the use of New Jersey law in enforcing it. What is missing, however, is fire – *i.e.*, concrete examples of such conduct (if they exist). Given that Deitch Media and Beacon Media are one and two steps removed, respectively, from a named defendant, Aquawood, this is understandable; one could hardly expect International Playthings to know the intimate details of their contract negotiations.[7]

In short, while one might infer that Aquawood, through its agent, had continuous and systemic conduct with a New Jersey-based firm, the facts are lacking. Accordingly, I now turn to the specific jurisdiction test.

B. Is There Specific Jurisdiction over Aquawood?

The first step in the specific jurisdiction analysis is whether Aquawood purposefully directed its activities at the forum. *O'Connor v. Sandy Lane Hotel*

---

[7] Indeed, one can infer from International Playthings' opposition papers that they were entirely unaware of Deitch Media's role.

*Co., Ltd.,* 496 F.3d 312, 317 (3d Cir. 2007). International Playthings cites essentially the same contacts it pointed to for general jurisdiction, *i.e.* that Aquawood hired Beacon Media to run the nationwide ad campaign. I come, therefore, to the same conclusion as I did for general jurisdiction: at this point, International Playthings has not shown purposeful direction. Accordingly, I need not analyze the next two steps of the specific jurisdiction test.

In light of this, I will neither grant nor deny Aquawood's motion. Instead, I will permit International Playthings to obtain limited jurisdictional discovery relating to contacts between Deitch Media and Beacon Media as it relates to the allegedly infringing advertisement. The results will determine whether personal jurisdiction exists over Aquawood.

## IV. MANLEY TOYS AND TOY TECK (HONG KONG)'S MOTION TO VACATE

### A. Legal Standard

Federal Rule of Civil Procedure 55(c) provides that "the court may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). The decision whether to vacate a default judgment is left "to the sound discretion of the trial court." *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 245 (3d Cir. 1951). Such a determination is informed by the Third Circuit's policy disfavoring default judgments and encouraging decisions on the merits. *Id.*

The applicable factors that the district court must consider are: (1) whether lifting the default would prejudice the plaintiff; (2) whether the defendant has a prima facie meritorious defense; (3) whether the defaulting defendant's conduct is excusable or culpable; and (4) the effectiveness of alternative sanctions. *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 73 (3d Cir. 1987) (citing cases). Prejudice may have occurred where a plaintiff "assert[s] loss of available evidence, [an] increased potential for collusion or fraud, or substantial reliance upon the judgment . . . ." *Feliciano v. Reliant Tooling Co. Ltd.*, 691 F.2d 653, 657 (3d Cir. 1982). Any "doubts should be resolved in favor of setting aside the default and reaching a decision on the merits." *Gross v. Stereo Component Systems, Inc.*, 700 F.2d 120, 122 (3d Cir. 1983).

### B. Analysis

Applying these factors to the facts before me, I find that the default should be vacated.

### 1. *Prejudice to Plaintiff*

International Playthings argues that it would suffer prejudice from vacating the default because the default has created delay and because there is now an increased potential for collusion based on a number of other intellectual property suits to which Manley Toys is a party.[8]

I am not convinced. International Playthings itself waited months before seeking default.[9] More fundamentally, this factor requires more than the mere passage of time, which is inherent in virtually any default; "delay in and of itself does not constitute prejudice." *KPS & Associates, Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 15 (1st Cir. 2003). "The issue is not mere delay, but rather its accompanying dangers: loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." *Id.* (quotation omitted). International Playthings' contention that there is now an increased potential for collusion is conclusory and unpersuasive. It may be so that there are at least five intellectual property lawsuits in which Manley Toys is a named defendant, but I see no convincing factual connection between that circumstance and the contention that any delay attributable to the default has increased the probability of collusion. This factor does not weigh against vacating the entry of default.[10]

### 2. *Meritorious Defense*

The second factor is whether the defendant has a meritorious defense. "The showing of a meritorious defense is accomplished when allegations of defendant's answer, if established on trial, would constitute a complete defense to the action." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984) (quotation omitted). Manley Toys and Toy Teck (Hong Kong) state that the court does not have personal jurisdiction over them. In addition, they believe they did not violate the Lanham Act because they do not sell a

---

[8] International Playthings does not contend that loss of evidence is an issue.

[9] International Playthings served the First Amended Complaint by Federal Express on June 8, 2012, which were accepted and signed for on June 11, 2012. Over six months later, on December 21, 2012, it requested a clerk's entry of default against Manley Toys and Toy Teck (Hong Kong) [Docket No. 62].

[10] International Playthings also suggests that the Defendants might resume their allegedly infringing ad campaign. I do not give this argument much weight, because the preliminary injunction that Judge Wigenton issued against showing this particular Teacup Families advertisement remains in force.

competing product. A superficial survey of reverse palming off cases indicates that such cases typically involve selling either the competitor's actual product or a slightly modified version of it.[11] *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 131 (2d Cir. 2004) ("Reverse palming off under the Lanham Act occurs, simply stated, when A sells B's product under A's name."); *Roho, Inc. v. Marquis*, 902 F.2d 356, 359 (5th Cir. 1990) ("Reverse palming off occurs with the direct misappropriation of the services or goods of another. A defendant may also be guilty of reverse palming off by selling or offering for sale another's product that has been modified slightly and then labeled with a different name."); *see, e.g., Syngenta Seeds, Inc. v. Delta Cotton Co-op., Inc.*, 457 F.3d 1269, 1278 (Fed. Cir. 2006) (sale of seeds); *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 578 (7th Cir. 2005) (sale of imitation computer desk); *Lamothe v. Atl. Recording Corp.*, 847 F.2d 1403, 1405 (9th Cir. 1988) (selling sheet music without mentioning two of three coauthors); *Arrow United Indus., Inc. v. Hugh Richards, Inc.*, 678 F.2d 410, 412, 415 (2d Cir. 1982) (preliminary injunction issued prohibiting defendant from modifying Arrow–Foil dampers in size and other minor respects and relabeling them); *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1213, 1221 (8th Cir.) (in sales literature, a farm equipment manufacturer used photographs of a competitor's grain trailer that had been labeled as its own product), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 648, 652 (D. Del. 2006) (sale of seeds); *Matsushita Elec. Corp. of Am. v. Solar Sound Sys., Inc.*, 381 F. Supp. 64, 66–67, 70 (S.D.N.Y. 1974) (defendant enjoined from using one of plaintiff's radios,

---

[11] The Supreme Court has defined "reverse passing off" (also known as "reverse palming off") as "misrepresent[ing] someone else's goods or services as his own" and has held that it is actionable under § 1125(a) of the Lanham Act. *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n. 1, 30 (2003). The Second Circuit has outlined four elements a plaintiff must show:

(1) that the work at issue originated with the plaintiff;

(2) that origin of the work was falsely designated by the defendant;

(3) that the false designation of origin was likely to cause consumer confusion; and

(4) that the plaintiff was harmed by the defendant's false designation of origin.

*Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995).

which had been slightly modified and then relabeled, to advertise the sale of defendant's radio).

International Playthings alleges that the Defendants have taken the Calico Critters Cozy Cottage (International Playthings' product), slightly modified it, and included it in their advertisement. (FAC ¶¶ 40-43). The Teacup Families line, however, only includes one home, which International Playthings readily acknowledges "does not closely resemble Plaintiffs' Cozy Cottage." (FAC ¶ 37). Thus, a key aspect of a reverse palming off claim – that the alleged infringer is *selling* another's work – seems to be missing here.

Some courts of appeals have found that "the gravamen of the injury" in a reverse passing off case is that the "'originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product.'" *Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir.1994) (quoting *Smith v. Montoro,* 648 F.2d 602, 607 (9th Cir. 1981)); *see also Roho, Inc. v. Marquis,* 902 F.2d 356, 359 (5th Cir. 1990); *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.,* 35 F.3d 1226, 1242 (8th Cir. 1994). The Cozy Cottages in the advertisement were altered to some extent, and the Teacup Families product line concededly does not feature a similar house at all. Thus there may be problems, or at least novel issues, in connection with establishing reputational damage, injury to goodwill, or the need to take corrective action. I recognize that the commercial's misleading portrayal of an appealing, full Teacup Families neighborhood might sway consumers to purchase Teacup Families products. But the advertisement might do the opposite: on discovering that the Teacup Families line is limited, a customer might decide to buy Calico Critters instead because it more closely resembles what he or she saw in the advertisement.

In addition, of course, Manley Toys and Toy Teck (Hong Kong) assert the factual defense that had nothing to do with creating the allegedly infringing advertisement.[12]

---

[12] Of course, they would potentially be liable for acts done on their behalf. A party can be secondarily liable for copyright infringement. *See, e.g., Parker v. Google, Inc.,* 242 F. App'x 833, 837 (3d Cir. 2007) (non-precedential) ("To allege a claim of contributory copyright infringement, a plaintiff must allege: (1) direct copyright infringement of a third-party; (2) knowledge by the defendant that the third-party was directly infringing; and (3) material contribution to the infringement"). This is particularly true in an agency context. *Gershwin Pub. Corp. v. Columbia Artists Mgmt.,*

This appears to be a relatively novel Lanham Act fact pattern. For purposes of this motion to vacate, however, it appears that Manley Toys and Toy Teck (Hong Kong) may have meritorious defenses.

### 3. *Defendants' Culpable or Excusable Conduct*

Manley Toys and Toy Teck (Hong Kong) claim that their default is excusable because service of process was not proper. Specifically, International Playthings attempted to serve the First Amended Complaint by Federal Express, which Manley Toys and Toy Teck (Hong Kong) argue does not comply with the Hague Convention's rules of service for foreign entities. They also claim never to have received the First Amended Complaint, in part because their mailing address is a large office complex with dozens of other businesses.

In the District of New Jersey, Article 10(a) of the Hague Convention authorizes service of process by registered mail so long as the receiving country has not filed an objection to that method of service. *Rogers v. Kashara*, Civ. No. 06–2033, 2006 WL 6312904, at *3–4 (D.N.J. Oct. 16, 2006); *Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 473 (D.N.J. 1998); *Trump Taj Mahal Assoc. v. Hotel Serv., Inc.*, 183 F.R.D. 173, 176–79 (D.N.J. 1998). Hong Kong has not filed an objection. *See TracFone Wireless, Inc. v. Unlimited PCS Inc.*, 279 F.R.D. 626, 631 (S.D. Fla. 2012) (citing cases). Article 10(a), however, limits such service to permissible postal channels. The question is thus whether Federal Express fits into that category. That remains an open question within this District, although other courts have answered in the affirmative. *See id.* ("the Court concludes that FedEx is a permissible postal channel under Article 10(a)" for the Clerk to send the summons and complaint); *TracFone Wireless, Inc. v. Sunstrike Int'l, Ltd.*, 273 F.R.D. 697, 699 (S.D. Fla. 2011) ("serving Hong Kong Defendants with a copy of the summons and amended complaint sent via international express mail and via FedEx directed to their President, General Manager, or other executive officer at their respective headquarters, is permissible pursuant to Rule 4(f)(2)(C)(ii)"); *R. Griggs Grp. Ltd. v. Filanto Spa*, 920 F. Supp. 1100, 1106–08 (D. Nev. 1996) (recognizing service by FedEx as service through "postal channels" under Article 10(a) of the Hague Service Convention); *Wong v. Partygaming Ltd.*, Civ. No. 1:06-2376, 2008 WL 1995369, at *3 (N.D. Ohio May 6, 2008) (finding service complied with Article 10(a) where "plaintiffs sent a copy of the complaint to each defendant via DHL, a proper

---

*Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (vicarious liability of copyright infringement doctrine was initially predicated on the agency doctrine).

method of service under the Hague Service Convention, and provided the court with proof of service. Accordingly, the court finds that service was proper.").

I need not, however, delve deeply into this issue because, in the end, it does not bear heavily on whether Manley Toys and Toy Teck (Hong Kong)'s conduct was culpable. It appears they never received the complaint. (Decl. of Francis Tse[13] ¶ 2 [Docket No. 63-2]; Decl. of Raymond Fong[14] ¶ 2 [Docket No. 63-4]). Had they received it, the Court thinks it likely that they would have litigated the case because the companies have been, as International Playthings points out, fairly active litigants in United States courts. (Opp. at 12, 15-17). Thus, I do not conclude that Manley Toys and Toy Teck (Hong Kong)'s conduct was culpable.

International Playthings also claims that Manley Toys and Toy Teck (Hong Kong) were aware of the claims in September 2012. At that time, only Aquawood was served the complaint, and their insurance carrier – which also was the carrier for Manley Toys and Toy Teck (Hong Kong) – referred the claim to the law firm of Milber, Makris, Plousaids and Seiden, LLP ("Milber, Makris") and asked it to represent all three entities, seemingly without the knowledge of Manley Toys or Toy Teck (Hong Kong). Milber, Makris asked for International Playthings' consent to extend the time to answer or otherwise respond. International Playthings offered to do so if the firm would accept service on behalf of Manley Toys and Toy Teck (Hong Kong). The law firm was not authorized to, and did not, accept such service. I do not conclude, as International Playthings wishes, that this is culpable conduct.[15]

In short, on the excusable-culpable continuum, Manley Toys and Toy Teck's conduct tends towards the excusable.

### 4. *Effectiveness of Alternative Sanctions*

Neither party squarely addresses this factor. International Playthings does not even request a monetary sanction to compensate it for opposing the Defendant's motion. Accordingly, alternative sanctions are not appropriate.

---

[13] Mr. Tse is the manager of Toy Teck (Hong Kong), responsible for litigation matters.

[14] Mr. Fong is the manager of Manley Toys, responsible for litigation matters.
[15] When they finally were personally served on January 31, 2013, a default had already been entered against them. At that point, filing an answer would have been futile.

The four factors thus weigh in favor of vacating the default with respect to Manley Toys and Toy Teck (Hong Kong). Given the discretion given to district judges and the Third Circuit's policy of encouraging decisions on the merits, the Court concludes that the entry of default must be vacated. Accordingly, the motion of Manley Toys and Toy Teck (Hong Kong)'s to vacate the default is granted.

## V.     CONCLUSION

For the reasons stated above, the motions of August and Aquawood will be **ADMINISTRATIVELY TERMINATED,** subject to reinstatement at the completion of limited discovery directed to the issue of personal jurisdiction. The motion of Manley Toys and Toy Teck (Hong Kong) to vacate a default is **GRANTED**. An appropriate order follows.

KEVIN MCNULTY, U.S.D.J.

Date: July 23, 2013